## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KYMBERLY A. BECK,　　　　　　　　　　　Case No. 1:10-cv-398
　　　Plaintiff　　　　　　　　　　　　　　Weber, J.
　　　　　　　　　　　　　　　　　　　　　Litkovitz, M.J.

　　vs

COMMISSIONER OF　　　　　　　　　　**REPORT AND**
SOCIAL SECURITY,　　　　　　　　　　 **RECOMMENDATION**
　　　Defendant

　　　　Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 10), the Commissioner's response in opposition (Doc. 12), and plaintiff's reply

memorandum. (Doc. 13).

### PROCEDURAL BACKGROUND

　　　　Plaintiff was born in 1964 and was 40 years old at the time her insured status expired in

March 2005.  Plaintiff has a college degree and past relevant work experience as a sales

representative.  (Tr. 31, 128, 133, 143, 153).

　　　　Plaintiff filed an application for DIB on March 8, 2007, alleging disability since July 1,

2001, due to restless leg syndrome, bipolar disorder, anxiety, schizoaffective disorder, attention

deficient disorder, and hallucinations.  (Tr. 118, 127).  Plaintiff's application was denied initially

and upon reconsideration.  Plaintiff requested and was granted a *de novo* hearing before an

administrative law judge (ALJ).  On November 3, 2009, plaintiff, who was represented by

counsel, appeared and testified at a hearing before ALJ Thomas R. McNichols, II.  (Tr. 27-73).

A vocational expert (VE), William J. Braunig, also appeared and testified at the hearing. (Tr. 73-91).

On December 3, 2009, the ALJ issued a decision denying plaintiff's DIB application. (Tr. 9-20). The ALJ determined that plaintiff last met the insured status requirements for DIB on March 31, 2005. (Tr. 11). The ALJ found that through the date last insured, plaintiff suffered from severe impairments of schizoaffective disorder, anxiety disorder, and attention deficit disorder, but that such impairments or combination of impairments did not meet or equal the level of severity described in the Listing of Impairments. (Tr. 11, 14). The ALJ determined that plaintiff's allegations concerning the intensity, duration and limiting effects of her impairments are not entirely credible. (Tr. 13). Through the date last insured, the ALJ determined that plaintiff had the residual functional capacity (RFC) to perform medium exertional work with the following limitations: no exposure to the general public; limited contact with co-workers and supervisors; no climbing ropes, ladders, or scaffolds (due to reported concentration deficits); no exposure to hazards (again, due to reported concentration deficits); only low stress jobs with no production quotas and no over-the-shoulder supervision; no requirement to maintain concentration on a single task for longer than 15 minutes at a time; and only simple one- or two-step tasks requiring little, if any, concentration. (Tr. 15). The ALJ determined that plaintiff was unable to perform any past relevant work. (Tr. 17). The ALJ concluded that through the date last insured and given the above RFC, plaintiff could have performed a significant number of medium, light and sedentary level jobs in the local and national economy, including jobs as a laundry laborer and dining room attendant, mail clerk, office helper, dowel inspector, or microfilm document preparer. (Tr. 18). Consequently, the ALJ found that plaintiff was not

2

disabled under the Act at any time from July 1, 2000, the alleged onset date, through March 31, 2005, the date last insured and therefore not entitled to DIB.  The Appeals Council denied plaintiff's request for review (Tr. 1-3), making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.  The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(1), 423.  Establishment of a disability is contingent upon two findings.  First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).  Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

3

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without

4

consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three for an adult. 20 C.F.R. § 416.920a. The special procedure also applies when

5

Part A of the Listing is used for an individual under age 18. *Id*. At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Rabbers v. Commissioner Social Sec. Admin*., 582 F.3d 647, 653 (6th Cir. 2009) (citing 20 C.F.R. § 404.1520a(b)(1)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id*. (citing 20 C.F.R. § 404.1520a(c)(3)).

The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id*. (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.; *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008)). The degree of limitation in the first three functional areas is rated using the following five-point scale: None, mild, moderate, marked, and extreme. *Id*. (citing 20 C.F.R. § 404.1520a(c)(4)). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. *Id*. If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id*. (citing § 404.1520a(d)(1)). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *Id*. (citing § 404.1520a(d)(2)).

At step three of the sequential evaluation, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." *Id*. A claimant whose impairment meets the requirements of the Listing will be deemed conclusively disabled. *Id*. If the ALJ determines that the claimant has a severe mental impairment that neither meets nor

6

medically equals a listed impairment, the ALJ will then assess the claimant's RFC before completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor. *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2); *see also Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide

7

a detailed, longitudinal picture of your medical impairment(s) and may bring a unique

perspective to the medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examinations, such as consultative examinations or brief

hospitalizations." 20 C.F.R. § 404.1527(d)(2).

    If the ALJ does not give the treating source's opinion controlling weight, then the ALJ

must consider a number of factors when deciding what weight to give the treating source's

opinion. 20 C.F.R. § 404.1527(d).  These factors include the length, nature and extent of the

treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii);

*Wilson*, 378 F.3d at 544.  In addition, the ALJ must consider the medical specialty of the source,

how well-supported by evidence the opinion is, how consistent the opinion is with the record as a

whole, and other factors which tend to support or contradict the opinion.  20 C.F.R. §

404.1527(d)(3)-(6); *Wilson*, 378 F.3d at 544.  The ALJ must likewise apply the factors set forth

in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a

non-treating source. 20 C.F.R. § 404.1527(d).  When considering the medical specialty of a

source, the ALJ must generally give "more weight to the opinion of a specialist about medical

issues related to his or her area of specialty than to the opinion of a source who is not a

specialist." 20 C.F.R. § 404.1527(d)(5).

    If the Commissioner's decision is not supported by substantial evidence, the Court must

decide whether to reverse and remand the matter for rehearing or to reverse and order benefits

granted.  The Court has authority to affirm, modify, or reverse the Commissioner's decision "with

or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501

U.S. 89, 98 (1991).

8

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990 WL 94, at *3 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL RECORD

Plaintiff treated with psychiatrist, Geraldine Wu, M.D., from November 21, 2002, to February 16, 2003. (Tr. 199-201). Dr. Wu listed plaintiff's diagnoses as bipolar II disorder, mixed and alcohol abuse and dependence. Dr. Wu noted plaintiff's symptoms included mood swings, anxiety, agitation, and depression and alcohol abuse. Dr. Wu reported that she tried

9

plaintiff on Lithium, but she did not have a good response. Plaintiff did not believe she had bipolar disorder and did not return for treatment. (Tr. 200-01). Dr. Wu concluded that she was not able to assess plaintiff's impairment. (Tr. 201).

On December 27, 2002, plaintiff reported to her family physician that Celexa and Lithium were not helping her mood and she admitted to "seeing things others aren't seeing." (Tr. 216).

Plaintiff began seeing psychiatrist, R. Stewart Kravetz, M.D., beginning January 2003, and the record contains his progress notes from January 2003 to December 2003. (Tr. 302-320). During the initial evaluation, Dr. Kravetz reported plaintiff's affect was anxious. (Tr. 317). Her mood was depressed and labile. She was agitated, but she was oriented and her affect was full range from bright to anxious. *Id.* Her speech was rapid. *Id.* Dr. Kravetz's initial diagnostic impressions were bipolar II disorder and rule out schizoaffective disorder. He assigned plaintiff a Global Assessment of Functioning (GAF) score of 50. (Tr. 320).[1]

On January 28, 2003, Dr. Kravetz found plaintiff to be hypomanic, and she was described as impulsive, agitated, anhedonic, anxious, irritable, labile and sad. (Tr. 311). Delusions and hallucinations were also noted. In February 2003, plaintiff was described as agitated, anxious, depressed, irritable, labile and sad. (Tr. 309-310). Hallucinations and sleep disturbance were present. *Id.* Dr. Kravitz also prescribed Zyprexa. On March 18, 2003, plaintiff was initiated on Risperdal 0.5 mg twice daily in conjunction with her Lithium. She was tearful and described as having a disordered and obsessive thought process, and her Lithium and

---

[1] GAF is used to report the clinician's judgment of the individual's overall level of functioning. GAF is divided into functioning ranges and scored on a scale of 0 (an individual is found to be a danger) to 100 (an individual is found to have superior functioning in a wide range of activities). *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM-IV-TR). The DSM-IV categorizes individuals with GAF scores of 41 to 50 as having "serious" symptoms. *See* DSM-IV at 32.

10

Risperdal were increased. (Tr. 307). Hallucinations and paranoid ideation were noted in April

2003, and plaintiff was described as being "manic for 2 weeks." (Tr. 306). At that time, plaintiff

was further found to have a disordered and distractible thought process, and was also anxious,

depressed, irritable, labile and sad. *Id.* Treatment notes from May 2003 described plaintiff as

argumentative, agitated, tearful, angry, anxious, depressed and sad with a labile mood. (Tr. 304).

On August 4, 2003, Dr. Kravetz indicated that plaintiff reported a "bipolar down" on Lithium

and noted that her behavior was cooperative, impulsive and agitated. He also noted the presence

of sleep disturbances. (Tr. 303). In December 2003, Dr. Kravetz indicated that plaintiff was

withdrawn and feeling on the edge of another depressive episode. (Tr. 302). Although going

into semi-retirement at the beginning of 2004, Dr. Kravetz continued to prescribe medication for

plaintiff throughout 2004 and into the first part of 2005. (Tr. 40, 321).

      Plaintiff began individual therapy in May 2005 with psychiatrist, Mark E. Reynolds,

M.D., and continued through the date of the ALJ's decision. (Tr. 262-301, 337-55). During her

intake assessment, plaintiff described the presence of symptoms over a number of years, with a

diagnosis of Bipolar Illness being made two and a half years prior. Plaintiff described manic

symptoms lasting at least two weeks with elevated energy level, racing thoughts, irritability, a

decreased need for sleep, isolation, suicidal ideation and increased alcohol use. She endorsed

during her manic episodes the presence of visual hallucinations and paranoid delusions. She

would also experience auditory hallucinations involving the belief that she heard a radio playing.

During her depressive episodes she experienced hypersomnia, diminished energy level, impaired

concentration and a loss of enjoyment of activities. She experienced suicidal ideations during her

depressive episodes. She endorsed (during these episodes) the auditory perception of the radio

11

and would catch shadows out of the corner of her eye (visual illusions). Plaintiff had been prescribed Eskalith Controlled Release 450 mg three daily, Risperdal 0.5 mg twice daily to three times daily, and Xanax 0.5 mg as needed. (Tr. 242, 265-67). Dr. Reynolds' initial diagnostic impressions were Bipolar Disorder Most Recent Episode Depressed, rule out Alcohol Abuse, Attention Deficit Disorder by history, and Anxiety Disorder not otherwise specified. (Tr. 242, 265). Dr. Reynolds assigned plaintiff a GAF of 65.

Dr. Reynolds treated plaintiff on a monthly basis from May 2005 though June 2007. (Tr. 262-301). On June 14, 2007, Dr. Reynolds completed a questionnaire about plaintiff's mental abilities. (Tr. 258). Dr. Reynolds reported that plaintiff had a poor ability to: relate to co-workers, the public and supervisors; deal with work stresses; function independently; and maintain attention and concentration. *Id.* She had a fair ability to follow work rules, use her judgment, and persist at tasks. *Id.* Plaintiff's hallucinations and lability of her affect limited her ability to function. (Tr. 259). Plaintiff had a poor ability to understand, remember and carry out detailed job instructions, and she had a fair ability to understand, remember and carry out simple job instructions. *Id.* Plaintiff's cognition was slowed because of her schizoaffective disorder and medications. *Id.* Plaintiff had a poor ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. *Id.* Dr. Reynolds opined that plaintiff was presently disabled and her mental impairments were disabling for at least six months before she first saw him. (Tr. 261).

Tonnie Hoyle, Psy.D., a state agency reviewing psychologist, evaluated plaintiff's mental condition based on the evidence of record on May 3, 2007. (Tr. 227-40). Dr. Hoyle concluded that there was insufficient evidence to establish the existence of a mental impairment during the

12

period at issue. *Id.* On August 7, 2007, another state agency reviewing psychologist, Vicki Casterline, Ph.D., affirmed Dr. Hoyle's assessment noting that office notes do not support that there was a continuous period of disability beginning before the date last insured. Dr. Casterline opined that by September 2005, plaintiff's psychotic symptoms were under "good control." (Tr. 323). Dr. Casterline noted that "she may be worse now, but the notes show that she was in good control at least 09/05 through 1/07." (Tr. 323).

On September 24, 2007, Dr. Reynolds sent a letter to plaintiff's counsel wherein he opined that plaintiff was disabled as of March 21, 2005, or before. (Tr. 242). Dr. Reynolds reiterated his findings upon his initial examination of plaintiff on May 12, 2005, as well as his initial diagnosis of Bipolar Disorder Most Recent Episode Depressed, rule out Alcohol abuse, Attention Deficit Disorder by history, Anxiety Disorder, and Social Phobia of a generalized type. *Id.* Dr. Reynolds also reported that it had been difficult to obtain a consistent level of mood stabilization, and in November 2005, he diagnosed Schizoaffective Disorder, bipolar type. (Tr. 243). According to Dr. Reynolds, "the combination of Schizoaffective Disorder and severe comorbid anxiety result in a profoundly disabling psychiatric condition." *Id.*

Dr. Reynolds reviewed office records from Dr. Kravetz from January to December 2003, and plaintiff's log of her symptoms from March to August 2003. (Tr. 243-44). Dr. Reynolds reported that based on a review of plaintiff's medical records, the onset of her schizoaffective disorder occurred prior to her initial evaluation by Dr. Kravetz in January 2003. He opined that based on the severity of plaintiff's symptoms at that time, plaintiff "was in no way" able to work in January 2003 and earlier. (Tr. 244). Dr. Reynolds felt that any suggestion that plaintiff

13

developed a disabling condition in April 2005 was inconsistent with plaintiff's "subjective and reliable report," the record of Dr. Kravetz, and psychiatric literature. (Tr. 244-45). According to Dr. Reynolds, plaintiff had a disabling condition for years before starting treatment. (Tr. 245).

On May 20, 2009, Dr. Reynolds reviewed his office notes in conjunction with the "case analysis" from the Social Security state agency psychologist who opined that plaintiff was in "good control" from September 2005 though January 2007 based upon a review of Dr. Reynolds' office notes. Dr. Reynolds clarified that his notes are clinical in nature and meant primarily to represent how a patient is responding to the interventions provided and "are not written with a goal of documenting occupational functioning." (Tr. 324). Dr. Reynolds noted that plaintiff "experiences a degree of denial of her condition" and that plaintiff has a strong desire to appear "normal," fearing she will face severe consequences if honest about the degree of her illness, including the loss of her marriage and subsequent custody of her children. *Id.*

That being said, Dr. Reynolds indicated that his notes "do not represent in any fashion that Ms. Beck was in 'good control' from September 2005 through January 2007." (Tr. 324). In that regard, Dr. Reynolds noted that in September 2005 plaintiff's antipsychotic medications were in transition, she was akathetic (a very uncomfortable sensation of motor restlessness associated with increased suicidal risk) and was placed on Propranolol. (Tr. 324-25). Dr. Reynolds explained that although plaintiff was reporting a significant decrease in her symptoms in October 2005, she was only beginning to show insight into her need for treatment. (Tr. 325). By November 2005, plaintiff had "cycled into depression, continue[d] to have hallucinations and [was] extremely anxious (worrisome)." *Id.*

14

Dr. Reynolds further represented that his notes from early 2006 show that plaintiff became syncopal on her medication and was overwhelmed by anxiety, interfering with her ability to drive her daughter even to extracurricular activities. Dr. Reynolds' notes reveal that in May 2006, plaintiff was "drinking three glasses of wine daily to deal with her anxiety and [was] so fearful of losing her husband (fear of her illness) she [was] trying to find employment, even though her anxiety and bipolar symptoms preclude success." *Id*. Thereafter, in July plaintiff recognized this activity was related to a manic phase and was again cycling into depression. *Id*. By August, plaintiff decided she does not need the medications due to her "lack of insight" relating to her condition. Plaintiff continued to be anxious and by Christmas of 2006 she was depressed. *Id*.

Dr. Reynolds further explained that his notes from January 2007 indicate that plaintiff was cycling into mania, and he reported that her hallucinations were increasing as well. In February 2007, she reported feeling anxious and "falling apart on the inside" and was unable to handle even small events in her life. In March 2007, Dr. Reynolds again changed plaintiff's antipsychotic medication due to continued symptoms. Notes from the remainder of 2007 document plaintiff's ongoing anxiety, paranoia, intrusive ego-dystonic homicidal thoughts, racing thoughts, and continued affective lability. Notes from 2008 show more paranoia, visual hallucinations, anxiety, and isolation. Dr. Reynolds concluded that "when combined with the understanding that these notes by nature focus on the positive symptoms of the illness and do not address the issues of motivation, diminished interpersonal skills and impaired cognitive function that clearly characterize this individual, they clearly document an individual who has been continuously disabled from May 2005 to present." (Tr. 325).

15

## OPINION

The pertinent period of time at issue concerns plaintiff's work abilities and limitations

between July 1, 2000 until March 31 2005.  (Tr. 118, 121).  To establish her claim for disability

benefits, plaintiff was required to establish that she was disabled on or before March 31, 2005,

the date her insured status expired for purposes of Disability Insurance Benefits.  *See Garner v.*

*Heckler*, 745 F.2d 383, 390 (6th Cir. 1984).  While plaintiff was not required to prove she was

disabled for a full twelve months *prior* to the expiration of her insured status, she was required to

prove "the onset of disability" prior to the expiration of her insured status and that such disability

lasted for a continuous period of twelve months.  *See Gibson v. Secretary,* 678 F.2d 653, 654 (6th

Cir. 1982); 42 U.S.C. § 423(d)(1)(A).

Post insured status evidence of new developments in plaintiff's condition is generally not

relevant.  *Bagby v. Harris*, 650 F.2d 836 (6th Cir. 1981).  *See also Higgs v. Bowen,* 888 F.2d

860, 863 (6th Cir. 1988) (evidence post-dating expiration of claimant's insured status is only

minimally probative).  However, such evidence may be examined when it establishes that the

impairment existed continuously and in the same degree from the date that plaintiff's insured

status terminated.  *Johnson v. Secretary of H.E.W.*, 679 F.2d 605 (6th Cir. 1982).  *See also King*

*v. Sec. of Health and Human Servs.,* 896 F.2d 204, 205-06 (6th Cir. 1990) (post-expiration

evidence may be considered, but must relate back to plaintiff's condition prior to expiration of

date last insured).

Plaintiff assigns one error in this case.  Plaintiff contends the ALJ erred by failing to give

proper deference or weight to the opinion expressed by her treating psychiatrist, Dr. Reynolds.

Specifically, plaintiff argues that the ALJ had no medical basis for his decision and he substituted

16

his own opinion for the opinion expressed by Dr. Reynolds. For the reasons that follow, the Court finds the decision of the ALJ is not supported by substantial evidence and should be reversed and remanded for further proceedings.

**I.    The ALJ's decision to afford Dr. Reynolds' opinion "little weight" is not supported by substantial evidence and should be reversed.**

Plaintiff began individual therapy with Dr. Reynolds on May 12, 2005, around six weeks after her insured status expired on March 31, 2005, and continued through the date of the ALJ's decision. (Tr. 262-301, 337-55). On June 14, 2007, Dr. Reynolds completed a Residual Functional Capacities Questionnaire wherein he opined that plaintiff was presently disabled and her mental impairments were disabling for at least six months before she first saw him. (Tr. 257-261). In a September 2007 letter to plaintiff's counsel, Dr. Reynolds provided a detailed and thorough analysis of plaintiff's mental condition and again opined that plaintiff was disabled as of March 21, 2005, or before. (Tr. 242-45). Thereafter, in May 2009, Dr. Reynolds submitted an additional letter to plaintiff's counsel, wherein he reaffirmed his conclusion that plaintiff "has been continuously disabled from May 2005 to present." (Tr. 325). In addition to his first-hand knowledge of plaintiff's condition as a result of a lengthy treatment history, Dr. Reynolds based his conclusion that plaintiff was disabled during the relevant period, in part, on his review of the treatment records from Dr. Kravetz, as well as plaintiff's subjective complaints at that time.

The ALJ gave "little weight" to Dr. Reynolds' findings. The ALJ stated that Dr. Reynolds' disability opinions were provided "substantially after the period at issue." (Tr. 12). The ALJ further concluded that Dr. Kravetz's treatment notes from the relevant period "generally indicate that the [plaintiff] made 'fair' progress with treatment" and "are not consistent with a

17

disabling mental impairment." (Tr. 13). As a result, the ALJ determined that "there is no evidence contemporaneous with the period at issue to support Dr. Reynolds' opinions in 2007 and after – most recently, in May 2009." (Tr. 12).

The ALJ's conclusion that Dr. Reynolds' opinions were entitled to little weight because they were rendered "substantially after the period at issue" and not supported by contemporaneous evidence for the relevant time period is without substantial support in the record or the law. The Sixth Circuit has recognized that courts are not precluded from examining evidence that arises after the expiration date of insured status to establish that a claimant was disabled before such date. *See Blankenship v. Bowen*, 874 F.2d 1116 (6th Cir. 1989). In *Blankenship*, the plaintiff had a history of psychiatric problems and was diagnosed with schizoid personality prior to the expiration of his insured status. Five months after the expiration of his insured status, a psychiatrist examined the plaintiff and found him totally disabled based on his psychological condition. *Id*. at 1120. The ALJ credited the opinion of this psychiatrist, selected the date of his examination as the onset date of plaintiff's disability, and rejected a finding of disability prior to the expiration of the date last insured. Reversing the decision of the ALJ, the Sixth Circuit found that the plaintiff's disabling psychiatric impairment "could not have occurred suddenly" on the date of the psychiatrist's examination, noting that the medical evidence of record showed the existence of a mental impairment prior to that examination and the expiration of insured status. The Court of Appeals held that the ALJ erred by not considering such evidence in establishing the onset date of disability. *Blankenship*, 874 F.2d at 1121. The Sixth Circuit recognized that "there is the common sense notion that appellant did not suddenly find himself, five months after the expiration of his coverage, completely incapacitated by his [mental]

18

disorder." *Id.* at 1122. *See also* Social Security Rule 83-20.[2] Thus, in the case of a medically

degenerative condition, it is not inappropriate to infer that the condition began at some time

before the evaluation showing objective evidence of the condition. *Id.* This is particularly true

when dealing with a slowly progressive impairment such as the psychiatric condition suffered by

the plaintiff in *Blankenship. Id. See also Fleenor v. Sullivan*, 899 F.2d, 1221, 1990 WL 41846,

at *3 (6th Cir. 1990).

       In this case, the ALJ took issue with Dr. Reynolds' opinions of disability because Dr.

Reynolds did not treat plaintiff during her period of insured status. The ALJ's decision states,

"[w]ithout belaboring the point, that period during which Dr. Reynolds has actually treated the

claimant and for which he has first-hand knowledge of her condition came *substantially after* the

period at issue." (Tr. 12) (emphasis added). The ALJ's conclusion in this regard misstates the

evidence of record. Notably, Dr. Reynolds began treating plaintiff just six weeks after the

expiration of her insured status, not "substantially after the period at issue" as found by the ALJ.

The evidence establishes that plaintiff's mental condition became progressively worse over time

and that the ALJ failed to consider Dr. Reynolds' longitudinal treatment history of plaintiff, as

well as his objective findings[3], in assessing the treating physician's opinions.

---

   [2] Social Security Ruling 83-20 provides that when impairments are progressive in nature, the
Commissioner must "infer the onset date from the medical and other evidence that describes the history and
symptomology of the disease process."

   [3]Objective medical evidence consists of medical signs and laboratory findings as defined in 20 C.F.R. §
404.1528(b) and (c). *See* 20 C.F.R. § 404.1512(b)(1). "Signs" are defined as "anatomical, physiological, or
psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown
by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena
that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory,
orientation, development, or perception. They must also be shown by observable facts that can be medically
described and evaluated." 20 C.F.R. § 404.1528(b).

"The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

Dr. Reynolds had treated plaintiff for over two years at the time he assessed plaintiff's mental residual functional capacity. The Social Security regulations recognize the need for longitudinal evidence in the case of mental impairments and that a claimant's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(2). Since the level of functioning at any specific time may seem relatively adequate or, conversely, rather poor, proper evaluation of plaintiff's mental impairments must take into account variations in levels of functioning in determining the severity of her impairments over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(2). Dr. Reynolds, as plaintiff's treating psychiatrist, was in the best position to evaluate plaintiff's functioning over time. Dr. Reynolds explained how the medical evidence he obtained over his lengthy treatment with plaintiff ultimately led him to a diagnosis of Schizoaffective Disorder, a diagnosis that the ALJ credited. In a detailed narrative report dated September 24, 2007, Dr. Reynolds stated that "it has been difficult to obtain a

20

consistent level of mood stabilization for Ms. Beck. In addition, during her treatment, the

persistence of the psychotic symptomology and its lack of clear correlation to her mood

symptoms led me to evolve her diagnosis in November 2005 to that of Schizoaffective Disorder,

Bipolar type." (Tr. 243). Dr. Reynolds stated further:

> Over the course of treatment, the severity and persistence of her anxiety disorder
> became much more evident. It is clear the combination of the Schizoaffective
> Disorder and severe comorbid anxiety result in a profoundly disabling psychiatric
> condition.

(Tr. 243).

The ALJ failed to consider this evidence and rejected Dr. Reynolds' functional

assessment out-of-hand because it was rendered in 2007. Although Dr. Reynolds' disability

opinions were rendered two years after the relevant period, he began treating plaintiff just six

weeks after her date last insured and explicitly related his opinion on plaintiff's functional

capacity back to the relevant time period. His opinions are supported by his detailed treatment

notes and clinical findings which establish the severity of plaintiff's Schizoaffective Disorder and

anxiety. The fact that Dr. Reynolds' treatment did not start until six weeks after plaintiff's

insured status lapsed was not a good reason for rejecting the treating psychiatrist's opinions.

*Blankenship*, 874 F.2d at 1121.

Moreover, there is substantial evidence contemporaneous with the period at issue that

supports Dr. Reynolds' opinion relating plaintiff's Schizoaffective Disorder back to before her

date last insured. Dr. Reynolds stated that he reviewed the office records from Dr. Kravetz and

the pharmacy medication expense report detailing plaintiff's prescription history. (Tr. 243).

Progress notes from Dr. Kravetz from January 2003 through December 2003 document the

21

severity of plaintiff's psychiatric condition. (Tr. 302-311). Records from January and February 2003 indicate plaintiff's mood was impulsive, agitated, anhedonic, anxious, irritable, labile and sad. (Tr. 309-10, 311). Delusions, visual hallucinations, and sleep disturbance were also present. In early March 2003, she was noted to be agitated, impulsive, anxious, and depressed, and was initiated on Risperdal 0.5 mg twice daily in conjunction with her Lithium. (Tr. 308). Two weeks later, plaintiff continued to be labile. Her thought process was disordered and obsessive, and her mood was angry, anxious, irritable and sad. Plaintiff's Lithium and Risperdal were increased. (Tr. 307). In April 2003, hallucinations and paranoid ideation are noted, and plaintiff was noted as being "manic for 2 weeks." (Tr. 306). At that time, plaintiff was agitated and her thought processes were disordered and distractible. Her mood continued to be anxious, depressed, irritable, labile, and sad. *Id.* A progress report later that month noted pressured speech, agitation, distractible thought process, and anxious, labile, depressed, and sad mood. (Tr. 305). Treatment notes from May 2003 describe plaintiff as argumentative, agitated, tearful, angry, anxious, depressed and sad with a labile mood. (Tr. 304). In August 2003, plaintiff reported a "bipolar down" on Lithium. Her behavior was cooperative, impulsive, and agitated along with the presence of sleep disturbances. Her mood was described as euthymic, congruent, anhedonic, anxious, depressed, labile, sad, and worthless. Lithium was increased to three times per day. (Tr. 303). In December 2003, Dr. Kravetz reported that plaintiff was withdrawn and feeling on the edge of another depressive episode. He noted occasional suicidal ideas. Dr. Kravetz also noted that plaintiff was "taking lessons" to be a realtor, but he reported that her "problem will be poor memory." (Tr. 302).

22

After reviewing these records, Dr. Reynolds opined that plaintiff's Schizoaffective

Disorder was present during her treatment with Dr. Kravetz, as Dr. Kravetz "consistently notes

the presence of delusions/hallucinations during what are either mixed and/or manic episodes" as

well as "the presence of mania and not hypomania." (Tr. 244). Based upon the description of

the severity of plaintiff's symptoms by Dr. Kravetz, Dr. Reynolds concluded that plaintiff "was

in no way able to effectively sustain remunerative employment beginning, objectively in January

2003 and most likely significantly earlier." *Id*.

     The only medical evidence arguably to the contrary was the opinion of Dr. Hoyle, the

non-examining State Agency psychologist who completed a Psychiatric Review Technique Form

on May 3, 2007, wherein she found insufficient evidence to establish the existence of a mental

impairment. (Tr. 227-239). Dr. Hoyle does not provide any narrative discussion in support of

her findings. Moreover, her opinion was rendered prior to Dr. Reynolds' detailed narrative

assessment of plaintiff's condition on September 24, 2007, and is not based on a complete case

record.

     In response to the State Agency psychologist's opinion that plaintiff was in "good

control" from September 2005 though January 2007 based upon a review of Dr. Reynolds' office

notes, Dr. Reynolds provided an additional narrative report on May 20, 2009. The detailed report

summarized and clarified his treatment notes for that period. Dr. Reynolds explained that his

notes are clinical in nature and meant primarily to represent how a patient is responding to the

interventions provided and "are not written with a goal of documenting occupational

functioning." (Tr. 324). Dr. Reynolds specifically identified the clinical findings establishing

plaintiff's severe anxiety, depression, manic episodes and hallucinations. Dr. Reynolds reiterated

that his treatment notes "document an ongoing affective lability and anxiety interfering with the ability to function outside of an occupational environment" and clearly document an individual who has been continuously disabled from May 2005 to present. (Tr. 324-25). When specifically asked for his opinion, Dr. Reynolds gave an unequivocal opinion that plaintiff was incapable of working at the time he first saw her in May 2005. He supported that opinion by providing a detailed summary of his treatment notes identifying the relevant clinical findings. (Tr. 324-25). The State Agency non-examining psychologist's opinion is not entitled to greater weight than those of Dr. Reynolds and does not provide substantial evidence for rejecting such opinions. *See Shelman*, 821 F.2d at 321; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

The ALJ failed to accord proper weight to the opinions of Dr. Reynolds in contravention of Social Security regulations and the law of this Circuit. Although the ALJ is not bound by a treating physician's opinion, he must set forth in his decision a reasoned basis for rejecting the opinion. *See Shelman*, 821 F.2d at 321. The ALJ's stated reasons in this case are without substantial support in the record. The ALJ failed to consider the length of treatment and supportability of Dr. Reynolds' opinions, as well as the proximity of his initiation of treatment with plaintiff to the date last insured, in assessing weight to Dr. Reynolds' opinions. In this case, Dr. Reynolds' opinions that plaintiff suffered from a disabling psychiatric impairment prior to her date last insured was made by a physician specializing in psychiatry, based on a well-documented and lengthy treatment history, and was not contradicted by any substantial evidence to the contrary. Accordingly, the ALJ erred to the extent he did not consider Dr. Reynolds' diagnoses and observations as valid evidence of mental disability. Based on the foregoing, the

24

undersigned finds the ALJ erred in rejecting the treating psychiatrist's opinion. The ALJ's decision is not supported by substantial evidence and should be reversed.[4]

## II.    The ALJ improperly displaced the findings of the treating psychiatrist with his own medical judgment.

While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, the ALJ cannot substitute his "medical" opinion for that of a treating or examining doctor. *See Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963). *Clifford v. Apfel*, 227 F.2d 863, 870 (7th Cir. 2000) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record."); *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2nd Cir. 1999) ("[T]he ALJ cannot arbitrarily substitute his own opinion for competent medical opinion.").

As noted above, Dr. Reynolds based his opinion that plaintiff was disabled during the relevant period, in part, on his review of the treatment notes from Dr. Kravetz. The ALJ determined that Dr. Kravetz's treatment notes do not support a disability finding and "generally indicate that the claimant made 'fair' progress with treatment." (Tr. 13). In reaching that conclusion, plaintiff asserts that the ALJ improperly made his own evaluation of the medical findings. The undersigned agrees.

---

[4]    Additionally, although the ALJ found that there was insufficient evidence to establish that plaintiff was disabled prior to the expiration of her insured status in March 2005, he also found sufficient evidence that plaintiff's Schizoaffective Disorder, anxiety and Attention Deficit Disorder were severe impairments "through the date last insured." (Tr. 11). Dr. Reynolds was the only psychiatrist to diagnose plaintiff with Schizoaffective Disorder and he did so in November 2005, after the expiration of her insured status. Accordingly, the ALJ's inconsistent treatment of the medical evidence further establishes that the ALJ's decision is not supported by substantial evidence and should be reversed. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (The Court cannot uphold the decision of an ALJ, even when there may be sufficient evidence to support the decision, if, "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

While the ALJ is correct in that Dr. Kravetz's treatment notes often indicate that plaintiff made "fair" progress towards her goals, such a conclusion improperly interprets Dr. Kravetz's progress notes that, when viewed in totality, clearly establish the severity of plaintiff's psychiatric conditions. For example, on March 4, 2003, Dr. Kravetz noted that plaintiff reported she was "doing well." (Tr. 308). However, just two weeks later, plaintiff was described as having disordered and obsessive thoughts and her Lithium and Risperdal were increased. (Tr. 307). Dr. Kravetz noted plaintiff's progress towards her goals as "poor to fair." *Id.* As detailed above, Dr. Kravetz consistently noted clinical findings such as the presence of mania, hallucinations and visual disturbances, sleep disturbances, anxiety, depression, and disordered and obsessive thought processes. (Tr. 302-311). These clinical findings clearly support the opinions of Dr. Reynolds and were improperly ignored by the ALJ. The ALJ's selective presentation of the more positive aspects of Dr. Kravetz's progress notes does not negate the findings set forth in the remainder of the therapy notes which contradict the ALJ's conclusion about Dr. Kravetz's records.

**III.   This matter should be remanded solely for a determination of the appropriate onset date and an award of benefits.**

When the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan,* 501 U.S. 89, 100 (1991).

26

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176; *see also Abbott*, 905 F.2d at 927; *Varley*, 820 F.2d at 782. The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176; *see also Felisky*, 35 F.3d at 1041; *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Such is the case here.

Here, proof of disability is overwhelming and remand will serve no purpose other than delay. Accordingly, this matter should be remanded for an award of benefits. As discussed above, based on the mental residual functional capacity assessment and narrative reports of Dr. Reynolds, plaintiff's severe psychiatric condition prevents her from sustaining gainful employment. The only question in this case is the appropriate onset date of disability.

Social Security Ruling 83-20 provides that when impairments are progressive in nature, the Commissioner must "infer the onset date from the medical and other evidence that describes the history and symptomology of the disease process." *Blankenship*, 874 F.2d at 1122. Dr. Reynolds noted that plaintiff was suffering from delusions/hallucinations with mixed and/or manic episodes and began exhibiting signs of Schizoaffective Disorder at least by January 2003 when she was treated by Dr. Kravetz. As such, Dr. Reynolds found that plaintiff likely suffered from Schizoaffective Disorder years before her formal diagnosis in November 2005. (Tr. 244). Dr. Reynolds further opined that plaintiff "was in no way able to effectively sustain remunerative employment beginning, objectively in January 2003, if not before." (Tr. 244). Thus, there is strong evidence that plaintiff's disability began before her insured status lapsed on March 31,

2005.  However, since the determination of the onset date of disability is a factual issue, this matter should be remanded solely for a determination of the appropriate onset date and an award of benefits.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED pursuant to Sentence Four of 42 U.S.C. § 405(g) consistent with this opinion and remanded for a determination of the appropriate onset date and an award of benefits.

Date: 6/9/11

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

KYMBERLY A. BECK,                         Case No. 1:10-cv-398
      Plaintiff                                Weber, J.
                                         Litkovitz, M.J.

      vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).